Dennis **RUTHERFORD**, Harold **Taylor** and Richard **Orr**, et al., Plaintiffs,

v.

Peter J. **PITCHESS** et al., Defendants.

No. CV 75–4111–WPG.

United States District Court, C. D. California.

July 25, 1978.

---

Terry Smerling, Fred Okrand, Jill Jakes, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiffs.

John H. Larson, County Counsel, Frederick R. Bennett, Deputy County Counsel, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

This action seeks injunctive and declaratory relief, on constitutional grounds under 42 U.S.C. § 1983, against certain practices and conditions of confinement at the Los Angeles County Central Jail (the "jail"). The court previously has established the plaintiff class as consisting of all prisoners in the jail since December 31, 1975. The court found that the class is so numerous that joinder is impracticable; that the questions of law and fact and the claims presented by the class representatives are common to the class; and that the outstandingly competent representation provided the named plaintiffs by Terry Smerling, Esq., of the ACLU Foundation · of Southern California, will adequately protect the interests of the class as a whole.

The defendants are the Sheriff of Los Angeles County, some of his subordinates that are concerned with the administration of the jail, and the members of the County Board of Supervisors.

Trial of this case involved about seventeen days of testimony, the receipt of many exhibits, and the submission of thoroughly prepared pre-trial and post-trial briefs. In addition, with the prior agreement of counsel, the court made unannounced visits to the jail on September 23, 1977, and June 12, 1978.

The plaintiffs have challenged the constitutionality of many aspects of the housing and treatment of inmates at the jail. In this memorandum, I shall undertake to resolve these issues, bearing in mind, as best I can, the dilemma that confronts every federal judge before whom a case such as this is litigated. On the one hand, we are reminded that " . . . courts are ill equipped to deal with the increasingly urgent problems of prison [and presumably "jail"] administration and reform", *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and that considerations of institutional security should be left to the expertise of state correctional officials unless they "have exaggerated their response to these considerations." *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

On the other hand, these same decisions go on to state that "[c]ourts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties." *Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806, and that:

" . . . a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. at 405, 94 S.Ct. at 1807 (1974).

**108**

■ Every inmate in a penal institution, by the very fact of his incarceration, necessarily is deprived of some of the constitutional rights that otherwise would be his to enjoy. *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). But he retains those rights " . . . that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804. Of course, institutional security and order and the physical safety of jail personnel and inmates are necessarily paramount objectives of any jail administrator. If those were the only considerations, there would be no occasion for a court to "second-guess" the expertise of the Sheriff in pursuing such objectives. The problem, then, in each of the issues here concerned is to determine the point at which the implementation of the goals of security and order and safety must be balanced by the need to preserve for the inmate all of the constitutional rights that the fact of his incarceration will permit.

Issues of this nature have been brought to federal courts with increasing frequency during the past several years, and the task of accomplishing this balancing process is always difficult. Most courts are sympathetically mindful of the problems of the "jailer" and desire to defer to his experience and expertise to all appropriate extent. On the other hand, as Judge Frankel said in *United States ex rel. Wolfish et al. v. Levi,* 439 F.Supp. 114, 141 (S.D.N.Y.1977), " . . . the court is not free to blink away the common awareness that zeal for security is among the most common varieties of official excess."

■ So, in considering whether a prisoner is being denied his due process rights under the Fifth or Fourteenth Amendments, his First Amendment rights, or the right, accorded by the Eighth Amendment, to be free of conditions that constitute cruel and unusual punishment, the courts must seek to determine what is reasonable under the circumstances at hand. In *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205,

208, 96 L.Ed. 183 (1952), Justice Frankfurter delivered a wise admonition to courts engaged in making these determinations:

"The vague contours of the Due Process Clause do not leave judges at large. We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function. Even though the concept of due process of law is not final and fixed, these limits are derived from considerations that are fused in the whole nature of our judicial process."

Accordingly, I have sought to determine the issues here presented in light of the body of law that has developed by the decisions of other courts confronted with similar problems. In doing so, I have been impressed by Chief Justice Warren's observation in *Trop v. Dulles,* 356 U.S. 86, 100–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), that " . . . the words of the [Eighth] Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." I hope also to take heed of an equally pertinent comment by Justice (then Judge) Blackmun that in considering problems of the type here concerned, " . . . broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir. 1968).

■ One further consideration must be taken into account. Most of the inmates at the jail are pre-trial prisoners. They are there, not to receive punishment for their misdeeds, for their guilt has not yet been established. They are there because it has been deemed necessary to incarcerate them to insure their presence at trial. Thus, they are entitled to the least restrictive alternatives consistent with the purpose of their incarceration. *Brenneman v. Madigan,* 343 F.Supp. 128, 138 (N.D.Cal.1972).

We now deal with the specific complaints.

■ *Inadequacy of Cell Space.* The jail normally confines more than five thousand

inmates, a majority of whom occupy cells designed to hold four, six or eight men. The plaintiffs complain that these cells are impermissibly small in that they contain less than 25 square feet of floor space for each man, and that the larger part of this space is taken up by the bunks and toilet. The plaintiffs point out that such cell space is far less than the 40 square feet per inmate prescribed as a minimum by the California Minimum Jail Standards, 15 Cal. Adm.Code § 1081(d), and that several published judicial opinions have considered comparable, or even larger, space to be constitutionally inadequate. *See, e. g., Detainees of Brooklyn H. of Det. for Men v. Malcolm,* 520 F.2d 392, 398 (2d Cir. 1975) (20 square feet); *Moore v. Janing,* 427 F.Supp. 567, 572 (D.Neb.1976) (20 square feet); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 679 (D.Mass.1973); *aff'd on other grounds,* 494 F.2d 1196 (1st Cir. 1974), *cert. denied* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *aff'd on other grounds,* 518 F.2d 1241 (1st Cir. 1975) (44 square feet). In *Gates v. Collier,* 390 F.Supp. 482, 486 (N.D.Miss.1975), *aff'd on other grounds,* 525 F.2d 965 (5th Cir. 1976), Chief Judge Keady stated that "[w]e know from the undisputed evidence that generally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate."

Both from the testimony at the trial and from my personal inspection of the cell rows in the course of the September 23, 1977 visit, it is apparent to the court that the multiple occupancy cells in both the "old" and new sections of the jail and the general atmosphere in which they are located present poor examples of the civilized standards and concepts of dignity, humanity and decency to which Justice Blackmun made reference in *Jackson v. Bishop, supra.* The cells are much like those in the Hall of Justice Jail, as I pointed out in *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975), a case in which the living conditions there were held to be intolerable. However, the opinion in that case made a significant comparison. Hall of Justice inmates were confined in their cells almost constantly. By contrast,

" . . . inmates at the Central Jail have several advantages not available to Hall of Justice prisoners, the most important of which are that they take their meals in a dining room and have daily use of shower rooms located at the ends of the cell modules. Also, one of several day rooms is frequently available to Central Jail prisoners, where they may sit at tables and play games or write or talk. A chapel that will accommodate several hundred inmates is used for the presentation of occasional shows or musical entertainment, as well as regular church services." Id. at 1231.

The cells of the Central Jail are, indeed, small but in view of the frequent and substantial periods of time that the inmates are allowed to be out of their cells, I am not able to conclude that the matter of the limited number of square feet of sleeping space per man presents a constitutional issue that requires immediate action. Matters discussed later in this memorandum present problems that may require substantial modifications in the system of allocating prisoners among the penal facilities of Los Angeles County. It is expected that any such adjustment " . . . will take into appropriate account the increasingly enlightened standards with respect to the living space that should be accorded each inmate." *See, Stewart v. Gates,* 450 F.Supp. 583, 587 (C.D.Cal.1978).

■ The evidence at the trial disclosed the fact that from time to time a particular module becomes so crowded that there are more inmates than bunks. As a result, the "overflow" men are obliged to sleep on mattresses on the concrete floor of the cell or of the walkway that fronts a row of cells. As was indicated earlier in open court, I find this to be intolerable. "If the public, through its judicial and penal system, finds it necessary to incarcerate a person, basic concepts of decency, as well as reasonable respect for constitutional rights, require that he be provided a bed." *Stewart v. Gates, supra,* at page 588. An order

to such effect will be included in the judgment that will implement this memorandum.

■ *Visitation.* The plaintiffs complain that an inmate at the jail is separated from his visitor by a transparent glass partition and must use a "telephone" for voice communication. The defendants respond by emphasizing that to permit contact visits would increase the risks of physical harm, escape and importation of drugs and other contraband. They point out that the measures that would have to be taken to guard against such risks, including strip searches and greatly increased supervision, would make it impossible for the jail to accommodate the more than two thousand visits per day that are now being accorded.

It is evident that to allow unrestricted contact visitation would add greatly to the Sheriff's security problems and reduce the number of allowable visits. On the other hand, it is equally obvious that the ability of a man to embrace his wife and his children from time to time during the weeks or months while he is awaiting trial is a matter of great importance to him. The problem that confronts us here was well expressed by Judge Lasker in *Rhem v. Malcolm,* 371 F.Supp. 594, 605 (S.D.N.Y.1974); *aff'd* 507 F.2d 333 (2d Cir. 1974):

"There can be no doubt that the necessity of assuring security must be balanced against the right to humane treatment of prisoners, and that if contact visits are incompatible with that need they must be sacrificed. The critical question is whether the two can coexist."

It seems to me that a reasonable balance can be struck between these two valid considerations of security and prisoners' rights. Under the classification process that the Sheriff has established and is now implementing, within two weeks after an inmate arrives at the jail, the staff has learned enough about him to make a tentative evaluation as to whether he presents a security threat from the standpoints of being escape prone or drug oriented or otherwise, and he is classified accordingly. It is my understanding that a substantial proportion of the inmates are given a low risk classification in these respects. As to them, the dangers to security would appear not to be sufficient to justify depriving them of all physical contact with their loved ones, bearing in mind the supervision and post-visit searches that the custodial staff would administer.

In order that the additional processing not overburden the prison staff and thus curtail the total number of visits that it could reasonably handle, a qualified inmate might be limited in the number of contact visits that he might receive. At the outset, one visit per week might be appropriate, subject to modification in light of experience.

The evidence at trial indicated that most of the inmates remain at the jail less than one week. By restricting the contact visits to those who have been in the jail for two weeks and have received other than a high risk classification, and by imposing limits upon the frequency of their visits, it would appear that the numbers of such visits would be reasonably manageable.

Counsel for the defendants has advised that Biscailuz Center probably will be fully reactivated shortly as a place of pre-trial detention. In such event, it it is assumed that it will house a substantial number of low risk inmates that otherwise would be kept in the Central Jail. If this occurs, it will further ease the problem of according contact visits in the Central Jail, and the court would expect that this type of visitation would be established at Biscailuz Center.

This court is hopeful that the above described tentative proposal can enhance considerably the goal of treating the inmates with reasonable humanity without unduly increasing the problems of security. Any order implementing these comments concerning the allowance of contact visits will be withheld pending a further opportunity for the parties to express their views and suggestions. A hearing for that purpose will be scheduled shortly after the filing of this memorandum.

Under the present arrangement, 228 visitors are accommodated at one time in separate "telephone" cubicles and are allowed to remain twenty minutes. The defendants point out that the visiting facilities are in use twelve hours per day throughout the week; that 63,000 visitors are accommodated each month; and that logistical problems necessitate the twenty-minute limitation in order to accommodate the large numbers of weekly visits that are desired. The plaintiffs urge that this is too short a time, and they seek to show that hour-long visits could be accomplished without reducing the numbers of people that could be served.

It is evident that the Sheriff and his staff fully recognize the value of visitation, and they are to be commended for the attention and effort that they devote to accommodating such a large number of people. I am unable to conclude that whether individual visitors should stay only twenty minutes or could be allowed more time raises a constitutional issue that requires the court to second-guess the Sheriff in this matter.

Under present regulations, individuals under eighteen years of age are not admitted to the jail to visit an inmate unless they are accompanied by an adult. This means that a teenage person that is fully capable of coming to the jail alone would be unable to visit his or her father unless the mother or some other friend would be available to come along, a situation that, unfortunately, is not always the case. The reluctance of the Sheriff to open the jail to unaccompanied visits by children under any and all circumstances is understandable. Nonetheless, inmates should be permitted, upon prior request, to receive unaccompanied visits from their minor children.

*Outdoor Recreation.* Except for the corridors, or freeways, that front the rows of cells, the only areas available for physical exercise are portions of the roof of both the original jail and the new addition. Under schedules worked out by custodial personnel, prisoners are allowed two and one-half hours per week, at most, for recreation on the roof, in groups of about 130. This is considerably less than the daily outdoor exercise of one hour that several federal courts have required as a minimum. *See, e. g., Mitchell v. Untreiner*, 421 F.Supp. 886, 901 (N.D.Fla.1976); *Campbell v. McGruder*, 416 F.Supp. 100, 105 (D.D.C.1975); *Conklin v. Hancock*, 334 F.Supp. 1119, 1122 (D.N.H. 1971).

Neither citation of legal authorities nor testimony of experts is needed in order to convince this court of the importance of regular outdoor exercise to the physical health and emotional well-being of the men (particularly the young men) that make up the jail population. Clearly, they should have at least an hour for such purpose each day. The defendants do not challenge this. However, they understandably point out that the limited size of the rooftop areas available, the succession of complex routines that occur within the jail each day, and the logistical problems of controlling and moving large numbers of prisoners back and forth to the roof, limit substantially the opportunity for outdoor recreation.

The rooftop program was newly inaugurated at the time of trial, and the jail officials have had insufficient opportunity to assess the extent to which it reasonably can be expanded. Under all of the circumstances, including the defendants' apparent good faith desire to provide for adequate recreation, I am of the view that one hour per day should be considered a goal, rather than a constitutionally mandated minimum. The court will retain jurisdiction in order to assess the progress toward such goal. In the meantime, all prisoners, including those considered "high power" and those in administrative segregation, must be allowed not less than two and one-half hours of roof recreation per week.

The roof of the new portion of the jail provides a reasonably large open expanse. But the defendants have substantially ruined it as a place for basketball and other team sports by installing upright lengths of steel pipe every twenty-seven feet through-

out the floor surface. These uprights support steel "eye-beams" that, along with the eighteen foot high perimeter wall, support the heavy wire screen that covers the entire area. The top of the wall on two sides is about eighty feet above the ground that abuts it; on the third side the roof of the Inmate Reception Center is about thirty feet below the top of the wall.

Custodial personnel assert that the screen is necessary in order to counteract the risk of someone from the outside throwing a weapon over the wall and into the recreation area, and to prevent escape over the wall with the aid of a jail-made "grappling hook" and line or a suddenly formed human pyramid.

Here is one instance in which it seems to me that the concern for security has resulted in an exaggerated response. If the jail authorities were to put their minds to the matter, I am sure that they could find ways to remove all or most of those posts that so seriously diminish the adequacy of the roof for physical exercise, and still keep the escape and assault risks under reasonable control. Such study and consequent readjustment will be required.

■ *Indoor Recreation.* The plaintiffs complain that inmates are allowed insufficient time to use the day rooms or to "stretch their legs" by walking back and forth along the walkways ("freeways") that extend across the front of each row of cells. The defendants refer to a new program that began at about the time of trial under which all inmates, other than those of maximum security classification, have considerably increased use of the day rooms and freeways. Maximum security inmates are given access to the freeway on a limited basis. Inasmuch as they generally are considered to be assault-prone, they are not allowed in the day rooms and are escorted whenever they must be in areas where other people are present. The defendants appear to be heading voluntarily and appropriately in the direction of allowing as much day room and freeway time as scheduling problems and reasonable security considerations will allow. Therefore, no order in this respect is presently indicated.

The day rooms once had television sets, but as they became inoperative because of internal malfunction or vandalism, they were removed and not restored. Without implying any endorsement of the quality of most of the daytime television programs, it is obvious that people that are confined derive considerable recreational value from them. The jail authorities have agreed to re-establish television in the day rooms promptly. They should do so.

■ The plaintiffs complain of unconstitutional discrimination because inmates that agree to work, and thus become trusties, are given more privileges than are other prisoners. They may enter and leave their cells at will, have virtually unrestricted access to a day room and many other areas of the jail, and may attend weekly movies. I do not find such discrimination improper. Many menial chores must be performed regularly if the jail is to operate. In order to induce inmates to work at these tasks, the Sheriff is entitled to "hold out the carrot" of certain privileges that from a practical standpoint could not, or constitutionally need not, be accorded the general jail population. This is all that has occurred here.

■ *Windows.* A prisoner does not catch even a glimpse of the outside world throughout his entire time of confinement in the jail, other than the portion of the sky that he can see during his limited recreational periods on the roof. Thus, a man may go for many months without even seeing a bush or a tree or any human activity outside the jail. This was not always so. When the building was constructed, in about 1963, it contained perimeter windows of transparent "unbreakable" glass. Thus, prisoners in the exterior cells or mess halls or day rooms had a bit of sunlight and outside view. However, within a short period of time, inmates succeeded in destroying several of these "unbreakable" windows, either through vandalism or in fruitless escape attempts. The defendants responded by replacing all of the windows with solid sheets of steel.

In *Rhem v. Malcolm*, 432 F.Supp. 769, 778 (S.D.N.Y.1977), Judge Lasker held that to confine inmates so that they cannot see "the sun, sky or outside world" is a constitutional deprivation. This court agrees. Of course, as is recognized at the outset of this memorandum, constitutional rights must be limited by the reasonable requirements of security. But the conclusion is inescapable that this is another example of the response being more extreme than the danger against which it was directed.

Based upon visual observation, the lowest bank of windows is about twenty feet above the ground, and those of the next floor are about ten feet higher. In parts of the jail, the windows are immediately accessible to a person standing on the floor. In other places, they are much harder to reach. For example, along the upper tiers of the cells, a person would need considerable agility, dexterity and time in order to traverse the four-foot wide and very deep gap between the walkway and the wall in which the windows are set, maintain himself in a position to try to break a window, succeed in such attempt, and get through the opening.

I do not claim expertise in assessing the extent of the ingenuity of a prisoner determined to escape, nor am I aware of all of the appropriate means of frustrating such attempts. But when consideration is given to the vigilance and care with which inmates are watched and supervised, the heights of the windows above the ground, the possibility of satisfactory fire resistant unbreakable glass being available,[1] and, in any event, the ability to bar and/or screen windows, this court is simply unable to conclude that the need to guard against occasional benighted escape attempts warrants depriving all inmates of any view of the outside world. To liken the jail, in its present condition, to one of those infamous dungeons of medieval days would be unfair, because the jail is well-ventilated and reasonably well-lighted. But the action in sealing the place was a step in the wrong direction.

*Processing For Court.* On each court day, between 700 and 1,000 inmates are transported by bus to twenty-six courts scattered throughout the broad expanse of Los Angeles County. These prisoners are awakened at about 4:20 a. m., and, after being given breakfast, they are escorted to the Inmate Reception Center located in the same building complex as is the jail. Most of the men arrive there at about 5:30 a. m. and are distributed promptly among the more than thirty holding cells, each of which holds inmates bound for a particular court.

The holding cells are about fourteen feet by fourteen feet in linear dimension, and the only furnishing is a toilet. The early arrivals in the cell are able to lie or sit on the concrete floor, but as more men are added this becomes increasingly difficult and, eventually impossible. On the morning of my visit, I counted about twenty-eight men in several of the cells, a condition of "standing room only." One cell, number 21, became jammed with so many occupants that I could not count them. Finally, one of the deputies came and directed that about one-half of the men move to an adjacent cell that had been cleared. Twenty-two men responded to that order, and thereafter I was able to count at least thirty-two remaining occupants. The place remained excessively crowded.

The men stay in the holding cell for about an hour, and then, at about 6:15 a. m., the chaining process begins. The inmates from a particular holding cell form a line in the adjacent corridor. There they are handcuffed, and then the handcuffs of each four men are connected with a chain. The line thereupon moves gradually to the nearby parking lot and the men board the bus in such manner that two men of each group of four are seated immediately in front of the other two, with the connecting chain passing over the back of the seat that separates them. A little more than an hour after the start of the boarding process, the

1. Witnesses for the defendants insisted that such glass does not exist, but I am not con-
vinced as to the completeness of the search or the enthusiasm with which it was made.

buses begin to roll, and the time of the ensuing trip ranges from a few minutes to more than an hour, depending upon the destination and traffic conditions.

At the end of the court day, between 4:00 and 7:00 p. m. (sometimes much earlier), the reverse process begins. After the return bus ride, a shakedown examination, another substantial wait in a holding cell, and the evening meal, the men finally are returned to their cells, usually by about 8:00 p. m., but sometimes considerably later.

Any procedure involving the transportation to court of a group of detainees that present varied security risks is necessarily a demeaning experience for the prisoners. This is one of the regrettable but unavoidable consequences of pre-trial detention. But, bearing this in mind, I find the above described process to be constitutionally intolerable in two respects.

The first glaring problem concerns the holding cells. The sight of from twenty to fifty-four men being crammed into a fourteen-foot cell is a repelling experience in any society that takes pride in its high concepts of human dignity. The closest comparison that I can draw to such a spectacle is that of an overcrowded pig pen. If the defendants find it necessary to detain an inmate in a holding cell before placing him on a bus, or after his return, they must at least give him a place to sit on a bench or a chair.

This requirement clearly will create a difficult problem for the defendants, as well as for the court. It is obvious that the forthcoming order will reduce greatly the numbers of men that the present holding cells can contain, and it is doubtful that the Inmate Reception Center, as presently constructed, has space available for additional cells. On the one hand, considerations of constitutional rights and basic decency require that these dehumanizing conditions of holding cell detention be changed immediately. On the other hand, the Sheriff has been ordered by competent judicial authority (both state and federal) to move large numbers of prisoners back and forth to the various courts every day, and I cannot reasonably stop the present process in its tracks. The defendants must be given a minimum reasonable time within which to propose a solution that will make prisoners available to the courts and still treat them as human beings.

The second constitutional problem perceived in the present system for getting inmates to court is even more difficult. For a man to be subjected to the above described process that begins at 4:20 a. m. and ends at 8:00 p. m., or later, is inherently an exhausting and emotionally draining experience. To go through it once is bad enough; but to be obliged to repeat it for several successive days, or even weeks, while he is a defendant on trial, is believed to be constitutionally intolerable. Due process can hardly be accorded a defendant that is so worn out by the above described procedure that he lacks the alertness to help his attorney or to try to "put his best foot forward" in the presence of the trier of fact. The defendants in this case will be required to modify substantially the present procedure in order to avoid subjecting inmates on trial to such daily trauma.

It is true that most of the inmates go to court in custody only once or twice, because their cases are dismissed, or non-custodial sentences are imposed, or they are granted bail, or they plead guilty and are returned to court only for sentencing. But it is largely the fact that the Sheriff must transport so many men such long distances one or two times that makes it difficult for him to deal more reasonably with the prisoners that are undergoing trial.

As is indicated above, to be subjected even once or twice to the present process of busing large numbers of prisoners back and forth to outlying courts is emotionally draining and dehumanizing. Nonetheless, defendants in custody must be brought before the court, and if this is the only reasonable procedure with respect to prisoners not then undergoing trial, it scarcely can be challenged as unconstitutional. But the inherent need to haul so many men so far for purposes other than trial is far from evident, and if a reasonable and more humane

alternative is available, the constitutional rights of the inmates entitle them to it.

On the morning that I was present to view the process, thirty-two large and obviously very expensive six-wheel buses, each controlled by two deputy sheriffs and filled with inmates, left the parking lot. From casual conversation, it appeared evident that most of these men were scheduled for arraignment or for other purposes not requiring the presence of witnesses. It is not readily apparent why all judicial processes involving defendants in custody, other than trial and sentencing after trial, could not be performed in courtrooms constructed within, or immediately adjacent to, the Central Jail.[2] To the extent that locally assigned judges could not properly handle such calendars, it would be far less expensive and cumbersome for the Sheriff to transport one or more judges from an outlying courthouse to the jail than to bus a large number of prisoners to any such outlying court. One possibility worth considering is to establish and operate a system of closed circuit television as a means of conducting non-trial judicial procedures. This alternative would appear to be less expensive and far less arduous than busing many hundreds of prisoners all over the county every day. And, finally, if the governmental bodies of Los Angeles County remain determined that all phases of the criminal process shall continue to be handled in the outlying areas, they will be obliged to house their prisoners much closer to the respective courthouses.

■ Once the large "non-trial" proportion of inmates that make up the laborious collection and distribution program are eliminated therefrom, the court days can begin for prisoners currently on trial at a much more reasonable hour; the use of holding cells can be substantially reduced or perhaps even eliminated; and most of the large and expensive buses would not be needed. A reasonable time will be accorded the defendants within which to propose plans that will permit the processing of detainees going to court in a manner more closely in harmony with that in which a civilized society should deal with its prisoners.

However, as a matter of due process, no such delay can be tolerated with respect to inmates currently on trial. Beginning forthwith, on each day of trial after the first day, such inmates will be required to leave their beds not earlier than 6:00 a. m.; they will not be confined in holding cells, either before leaving for court or following their return; their waiting time on the buses at the jail will not exceed thirty minutes; and they will be returned to their cells not later than 8:00 p. m. An order to such effect will so provide.

■ *Telephones.* Evidence at the trial disclosed that the numbers of pay telephones in the cell blocks are insufficient to accommodate within a reasonable time inmates desiring to make calls. The public need to keep a person in custody pending trial does not justify cutting off his access to the outside world. He must be allowed to communicate by telephone with members of his family, or with anyone else he chooses, at all reasonable times. *O'Bryan v. County of Saginaw, Michigan,* 437 F.Supp. 582, 599 (E.D.Mich.1977).

■ The defendants opposed any thought of increasing telephone access at the jail by pointing to the relatively high incidence of coin cheating or fraudulent reference to credit cards attributable to telephones presently there. Reasonable supervision and monitoring by the jail authorities should be able to limit somewhat this abuse, and the telephone company has or can find ways of forestalling "credit card" calls from a particular telephone. In any event, occasional abuse cannot justify an "across the board" denial or limitation of telephone access.

An adequate number of telephones should be sufficiently proximate to the modules

---

2. A large unoccupied portion of one floor apparently could provide space for several modest courtrooms.

that each of the inmates desiring to use them may make at least one call per day. The defendants will be required to propose plans for the appropriate numbers and locations of additional telephones.

 *Cell Searches.* Jail authorities conduct "shakedown" inspections of the cells at irregular intervals in search of contraband or other items not allowed in the cells, such as food or excessive clothing or reading material. The defendants insist that these searches are accomplished with minimum disruption of the inmates' possessions. The plaintiffs paint quite a different picture. They contend that their property is left in disarray; that items are unnecessarily removed and destroyed; and that valuable property is taken without a receipt being given. In *United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114, 149 (S.D.N.Y.1977), Judge Frankel said, with respect to the identical problem:

"Allowing inmates to observe from a reasonable distance the searching of their rooms would go far to eliminate these grounds of complaint. An officer viewed by the owner is more likely to fulfill the stated duty to put things back as they were. The claim of stolen property is far less likely to be made, the grounds for suspicion, or ostensible suspicion, being largely obviated. Having one's things searched is no pleasure in the best of circumstances. Being denied the right even to watch the invasion is a blunt oppression."

This court agrees. Future shakedowns should be made while the respective inmates remain outside their cells but near enough to observe the process and raise or answer any relevant inquiry.

 *Time For Meals.* One of the grievances most frequently expressed by inmates that testified at the trial was that they were given insufficient time within which to eat their meals in the dining halls. The same contention was made before this court in the case of *Stewart v. Gates*, 450 F.Supp. 583 (C.D.Cal.1978), which involved the Orange County Jail. The comments made in that decision are equally applicable here and are incorporated accordingly:

"The court is sympathetic with the security concerns of the jail administrators when large numbers of inmates are congregated in a limited space in the presence of a relatively few unarmed deputies, which is what occurs during the serving of meals, and I agree that such instances should not be prolonged more than necessary. However, mealtime is an important occasion to a prisoner, and he should be entitled to savor his food, along with a bit of conversation, rather than be obliged to eat in a hurried atmosphere. An inmate should be allowed not less than fifteen minutes at the meal table, and an order will be issued accordingly." (450 F.Supp. at 588).

 *Clothing And Laundry.* Under California law, as implemented by the Sheriff's Department Custody Division Manual, an inmate's mattress cover, towel, socks, undergarments and outergarments are required to be exchanged for clean items at least once each week. As of the time of trial, this had not been occurring with regularity. Inmates reported having worn the same denim pants and shirts for as long as a month or more, and such testimony was eloquently confirmed by the appearance of their garments. Some inmates have washed their clothing in the toilet or while taking a shower and have dried the items as best they could. The defendants assured the court that the shortage of clothing for exchange was due to a temporary logistics problem that soon would be corrected. The court is willing to assume that this is so.

However, a once per week change of clothing for prisoners has been held to be completely inadequate in a growing number of federal cases. *See,* for example:

*Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 677 (S.D.Tex.1975) (daily exchange required); *Mitchell v. Untreiner,* 421 F.Supp. 886, 898 (N.D. Fla.1976) (daily exchange required); *Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 596 (D.P.R.1976), *aff'd on other grounds,* 537 F.2d 1 (1st Cir. 1976); 551 F.2d 877 (1st Cir. 1977)

(semi-weekly access to laundry required); *Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972) (uniform laundry twice a week); *Inmates of. Henry Cty. Jail v. Parham,* 430 F.Supp. 304, 307–308 (N.D.Ga.1976) (laundry twice a week; clean uniform three times per week).

An inmate must be permitted at least twice per week to receive clean outergarments, undergarments, socks and a towel in exchange for those that he has been using. An order will be made to that effect.

■ *Law Library For Pre-Trial Detainees.* Pre-trial detainees representing themselves ("pro pers") have regular use of an adequate law library in the jail. Another law library, on the second floor, is available to sentenced prisoners. A third law library, purportedly quite inferior to the other two, may be used by pre-trial prisoners with appointed or retained counsel. If they desire to use the second floor library, they must seek the permission of the Legal Sergeant.

The sergeant testified that the second floor library is relatively small and quite fully utilized by sentenced prisoners, and that he grants requests from others only if the applicant ". . . seems sincere and able to make use of it, rather than someone who is looking to use it just as an excuse to get out of their module for a while." He estimates that of the forty to fifty-five inmates that use the library each night, about fifteen are pre-trial prisoners who are there pursuant to permission.

The plaintiffs contend that the pre-trial detainees are entitled to unrestricted reasonable access to the second floor library. I am not able to agree. These inmates have counsel representing them in the pending proceedings, and they can supplement or second-guess the work of their counsel with the help of the limited library available to them. If they can show a legitimate reason why more exhaustive research by them is necessary, they are accorded the use of the larger library. If they are refused a request for more extensive library facilities in order to prepare litigation challenging conditions at the jail, their attorneys can help with such litigation or at least assist them in gaining access to the better library. In addition, the jail has an arrangement with Southwestern University under which its law students, supervised by law professors, provide legal assistance to inmates regarding civil matters.

In light of all of these circumstances, plus the constant availability of "jailhouse lawyers", it is concluded that the "access to the courts" provided to inmates at the jail is fully in compliance with the requirements expressed in *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970), aff'd sub nom., *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), and in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

■ *Brutality, Harassment And Abuse.* The plaintiffs contend that the deputy sheriffs on duty at the jail regularly use excessive force in enforcing their orders, commit unprovoked assaults, inflict verbal abuse upon the prisoners, and generally conduct a "reign of terror" at the jail. Much of the trial was devoted to hearing testimony of alleged victims of, or witnesses to, such improper conduct, and to hearing the deputies' versions of such incidents.

Controversies of this kind are extremely difficult to resolve. On the one hand, the deputies have a most difficult job. Their obligation is to maintain control and enforce discipline under circumstances in which the use of some force occasionally is needed on a snap judgment basis. And yet, the deputies are obliged to treat inmates with reasonable courtesy despite the vilification frequently directed toward them and the constant threat of physical harm under which they work. When they respond reasonably to situations that require immediate action, they must be upheld even though reflection in the calmness of the courtroom might lead to the conclusion that a softer response would have been preferable.

On the other hand, it is well known that there are such things as "badge happy" and sadistic custodial officers. And the courts,

as well as jail administrators, have an obligation to protect inmates against them.

After evaluating the evidence as best I could, it seems clear that there is no "reign of terror" at the jail that requires court intervention. It is obvious that in some instances the deputies used excessive force upon an inmate that they believed to have been "out of line". But for the most part, the deputies that testified at the trial and those that I observed in the course of my visits to the jail impressed me as having an enlightened attitude concerning their obligation to be respectful of the sensibilities of their prisoners.

However, the record at trial did disclose that the inmates frequently were annoyed by excessive and sometimes insulting use of the loudspeakers by the deputies in charge of the modules. It is noisy enough in the modules without the deputies making unnecessary announcements or subjecting the inmates to uncalled-for monologues. Such conduct is contrary to directives by the Sheriff, but it nonetheless is recommended that he give a renewed and emphatic reminder to all module deputies that misuse of the "intercom" will not be tolerated.

█ *Cost Of Compliance.* This court is well aware that compliance with portions of this decision will require some capital expenditures and increased operational costs. The court regrets this and is fully sympathetic with the budgetary problems faced by the County of Los Angeles, particularly in the present atmosphere of Proposition 13. Unfortunately, however, these budgetary problems cannot be used to defeat the changes mandated by this decision.

If state authorities, on behalf of the public authoritatively determine that it is necessary to incarcerate a person in the County Jail, such determination carries with it the obligation to pay the cost of maintaining that person in harmony with such of his constitutional rights as are consistent with incarceration. In other words, he must be housed and fed and clothed and otherwise treated as a human being. In the judgment of the court, the requirements of this decision go no farther, and they must be enforced accordingly.

*Implementing Judgment.* Some of the actions envisaged by this memorandum of decision will require a reasonable amount of time for planning and preparation. The court would prefer to prepare the judgment implementing this memorandum after consultation with counsel in order that the time schedules contained therein may take into appropriate account the problems that will be involved. Accordingly, a judgment will be withheld pending further hearing scheduled for *Monday, August 14, 1978, at 2:00 p. m.*