Filed 6/18/25  P. v. Pecot CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAWAN HAMEED PECOT,<br><br>    Defendant and Appellant. | C100290<br><br>(Super. Ct. No. 22FE014097) |

Defendant Dawan Hameed Pecot shot and killed Sean Bernal while committing a robbery at Capitol Casino in Sacramento.  A jury convicted defendant of first degree murder and robbery.  With respect to the murder, the jury found a special circumstance allegation to be true.  With respect to both counts, the jury also found that defendant personally discharged a firearm causing death.  The trial court sentenced defendant to state prison for a term of life without the possibility of parole plus 25 years to life.

1

On appeal, defendant claims that the conditions of his confinement during trial violated his constitutional rights by adversely impairing his ability to assist in his defense and to appear in a dignified manner before the jury. As we will explain, the contention is forfeited because defendant did not raise the constitutional issues in the trial court. Anticipating this conclusion, defendant also claims his trial counsel was ineffective for failing to raise the issues. Because defendant has not carried his appellate burden demonstrating ineffective assistance of counsel, we will affirm the judgment.

BACKGROUND

Bernal worked the graveyard shift as a security officer at Capitol Casino. At about 6 a.m. on August 22, 2022, defendant entered the casino wearing black pants, a black hooded sweatshirt, black gloves, a black ski mask, and red tennis shoes. He walked to the casino's cashier cage and forced his way inside. Bernal immediately confronted him with his taser drawn and ordered him out of the cage. Defendant was armed with a .40-caliber semi-automatic handgun, but did not draw his weapon. Instead, he complied with Bernal's commands without saying a word. Bernal escorted defendant out of the casino at taser-point, saying: "Keep walking or I shoot your ass." Bernal walked defendant through the main parking lot. When they got to Basler Street, adjacent to the parking lot, defendant drew his gun and quickly turned around. Bernal yelled "gun" and ran toward a cross-street. Defendant took a couple of steps toward Bernal and then ran back through the parking lot toward the casino.

R.C., the casino's floor supervisor, had seen Bernal escorting defendant outside and followed them to the parking lot. When defendant pulled the gun and started to run back toward the casino, R.C. ran inside and went into the cage, locking the door behind him. Moments later, R.C. heard someone punching a code into the cage's electronic door lock. Thinking the person might be an employee trying to get to safety, R.C. opened the door. Defendant pushed his way into the cage. R.C. told him not to shoot and ran out of the cage.

2

Bernal, who also doubled back to the casino, followed defendant into the cage as R.C. ran out. Bernal fired his taser, hitting defendant in the upper abdomen with only one electrode dart. Defendant fired his handgun, hitting Bernal in the neck. Defendant took about $38,000 from the cage and fled to a white Lexus parked on Basler Street. R.C. was outside the casino when defendant emerged. When defendant got to the Lexus, he opened the trunk, climbed inside, and closed the lid, then as sirens approached, defendant emerged from the trunk, fired a round in R.C.'s direction, and continued down Basler Street on foot, heading toward the American River levee.

Police arrived within minutes and apprehended defendant along the levee. He was wearing the same clothing described by witnesses to the robbery. He threw down his gun when officers made contact with him. And he had one taser dart sticking out of his hooded sweatshirt, along with a corresponding puncture wound to his abdomen. When police made contact with defendant, R.C. returned to the casino to check on Bernal. R.C. found Bernal lying on the ground with a gunshot wound to his neck. Bernal did not survive the shooting.

A forensic analysis of an expended shell casing found inside the casino's cashier cage and another such casing found on Basler Street revealed that those casings were fired by the gun that was in defendant's possession at the time of his arrest. The money stolen from the casino and black gloves were found in the trunk of the Lexus. The Lexus was registered to defendant's girlfriend; he had her permission to drive the car.

## DISCUSSION

Defendant contends the conditions of his confinement during trial violated his constitutional rights by adversely impairing his ability to assist in his defense and to appear in a dignified manner before the jury. He also asserts that his trial counsel was ineffective for failing to raise these issues in the trial court.

3

A

Defendant's trial began on November 13, 2023, with motions in limine and jury selection. The evidentiary portion of the trial spanned the next two days, November 14 and 15. On November 16, the parties met in the afternoon to discuss jury instructions. The next day of trial, November 27, occurred after the Thanksgiving break and involved jury instructions, closing arguments, and the jury's verdict.

On the morning of November 15, the second and final day of evidence, defense counsel raised the issue of defendant's confinement, referring to it as "rather chaotic." Defense counsel noted: "He indicates he was kept into a holding cell until 12:30 this morning. Yesterday he told me that he was, I believe, taken down to the branch [referring to Rio Cosumnes Correctional Center in Elk Grove] and then brought back here [referring to the Sacramento Main Jail] at 1:30 in the morning." The trial court received clarification from defendant that he was initially housed in Elk Grove, where he slept Monday night, after day one of the trial. The next morning, he was woken up at 1:30 a.m. and brought to the main jail before day two of the trial. After a full day of evidence, defendant was returned to the main jail and held in a holding cell until 12:30 a.m., at which point he was moved to a regular cell. Defendant said he was not fed dinner that night "because they already served dinner" by the time he was housed. Defense counsel also noted that defendant had not been permitted to shower at the main jail and was "nodding off" during the first day of evidence. Citing defendant's constitutional right to participate in his defense, defense counsel asked the trial court whether there was "any way that we can stabilize his situation so he can at least be given the opportunity to get a decent night sleep and a shower."

The trial court stated that it had previously ordered defendant to be housed at the main jail during trial, but given that the evidentiary portion of the trial would likely be finished that day, followed by the Thanksgiving break, the trial court did not "see any need to have [defendant] housed downtown for the next week and a half." Defense

4

counsel then asked the trial court to order defendant returned to the Elk Grove facility. Defendant confirmed that was his preference. The trial court stated that would be the order. Regarding the rest of the day, the trial court asked defendant whether he was following the proceedings. Defendant said he was. The trial court asked defense counsel whether he had any concern about proceeding with the trial. Defense counsel answered: "No, not this morning, but if a concern develops as we go through our long day, I'm going to voice it." Defense counsel also asked that defendant be fed over the lunch hour. The trial court stated that providing defendant with lunch "would be standard" and asked defendant whether he was given lunch the previous day. Defendant confirmed that he was fed lunch, but repeated that he missed dinner.

The trial court then stated: "All right. So correct me if I'm missing something, but it seems we're covered through the day. He is okay to participate today. I mean, we're talking, you're tracking what we're discussing, and after today's proceeding, assuming we're on schedule, he'll be transferred back to [the Elk Grove facility] for the next almost week and a half, and then we'd have one day of arguments and instructions and then deliberations." Defense counsel responded: "Yes. Thank you, your Honor. I feel I made my record." The trial court asked defense counsel: "Then unless there's some change in [defendant's] condition throughout the day today, at this point I'm assuming everything has been taken care of?" Defense counsel answered: "I will submit on that issue." The trial court asked whether it was "missing something." Defense counsel responded: "No, I don't feel that you are. And, as I said, if something develops I'll bring it up, but right now we're okay to proceed." Defense counsel did not raise the issue again for the remainder of the day.

The next day, the parties met in the afternoon to go over jury instructions. At the start of the instruction conference, the trial court noted that defendant declined to attend and asked defense counsel to comment. Defense counsel informed the trial court that defendant was not returned to Elk Grove as the trial court had ordered, adding: "This

5

is the fourth day that he has not had access to a shower." Defense counsel also raised an issue involving defendant's contact lenses, suggesting that defendant had not been able to take them out since he was transported to the main jail because his eyecare materials were at the Elk Grove facility, causing defense counsel to become "concerned for permanent damage to his vision."

The trial court said it understood the situation and had issued two orders for defendant to be returned to Elk Grove. It then stated: "I will do it again, and we'll check tomorrow. We will not be meeting on this case tomorrow, but this department will be in session on other matters, and we'll check tomorrow and we'll check Monday." The trial court noted defendant declined to attend the instruction conference because he had not showered and the trial court declined to order his appearance when his presence was not necessary. The trial court said it would continue checking and issuing orders until defendant was transferred.

The record is silent as to when defendant was transferred back to the Elk Grove facility, but by the next court date, November 27, the trial court confirmed with defendant that the transfer had occurred.

B

Defendant's constitutional claims are forfeited because he did not make "a motion for mistrial or other motion in which he asked the trial court to consider and rule on the contention" he now raises on appeal, i.e., that "adverse conditions of confinement . . . deprived him of [constitutional] rights." (*People v. Jenkins* (2000) 22 Cal.4th 900, 999-1000 (*Jenkins*); see also *People v. Sapp* (2003) 31 Cal.4th 240, 270 [constitutional issues forfeited for failure to raise them before the trial court].) Anticipating this conclusion, defendant asserts his trial counsel was ineffective for failing to request a mistrial on this basis.

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether

6

counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 206-207 (*Gray*).)

On the question of deficient performance, reasonable trial counsel could have concluded that a motion for mistrial based on defendant's conditions of confinement would have been properly denied by the trial court. Such a conclusion finds support in *Jenkins, supra*, 22 Cal.4th 900, in which the California Supreme Court rejected constitutional challenges that are similar to those raised in this appeal.

In *Jenkins*, the defendant claimed that "numerous adverse conditions" of his confinement violated his "right to due process of law, to assist in his own defense, to the effective assistance of counsel, to be present both physically and mentally at all proceedings against him, and 'not to be compelled to stand trial except when able to meaningfully assist his counsel.'" (*Jenkins, supra*, 22 Cal.4th at p. 999.) The challenged adverse conditions included, among other things, disruptive searches of his cell, being kept in solitary confinement for disciplinary infractions, receiving unappealing food, transportation schedules that deprived him of adequate sleep, and being shackled while waiting to appear in court. (*Ibid.*) Rejecting the defendant's argument that he was

7

deprived of the right to assist in his own defense, the court explained: "Even taking defendant's various complaints at face value, he was not deprived of all means of preparing his defense, but merely suffered circumstances he found disagreeable and disruptive." (*Id*. at p. 1001.) The court also noted that "due process of law prohibits the trial of an incompetent defendant," but the defendant did not attempt to establish incompetence under the state or federal Constitutions. (*Id*. at pp. 1001-1002.) Finally, while recognizing that certain conditions of confinement have been held, at least in the context of civil rights actions brought by pretrial detainees, to "so impair the defendant's ability to communicate with counsel or otherwise participate in the defense that a due process violation or an infringement of the right to effective assistance of counsel results," the court explained that "the circumstances described by defendant had no prejudicial effect on his ability to assist in his defense or on counsel's ability to defend him." (*Id*. at pp. 1002 & 1003.)

Here, defendant similarly argues that the conditions of his confinement violated his constitutional rights to due process, to effective assistance of counsel, and to equal protection. The constitutional challenges themselves are forfeited for failure to raise them below. But reasonable counsel, having read *Jenkins*, could have concluded that a motion for mistral based on the conditions of defendant's confinement would not have been successful. Taking the complaints of defendant and defense counsel at face value, defendant was transported from Elk Grove to Sacramento very early in the morning before the first day of evidence. At some point during the day, defense counsel said defendant was "nodding off," but counsel did not elaborate on the extent to which defendant may have missed portions of the evidence. The trial court did not indicate that it witnessed any inability of defendant to follow the proceedings. After that day of trial, defendant was not moved from the holding cell into a regular cell until very late and missed dinner. He was also unable to shower while at the main jail.

8

Although a trial court properly defers to a great extent on the judgment of jail authorities regarding the conditions of a pretrial detainee's confinement (*Jenkins, supra*, 22 Cal.4th at p. 1006, fn. 22), we are troubled by the claimed circumstances. Nevertheless, as in *Jenkins*, the record on appeal "does not indicate that the conditions of defendant's confinement so interfered with his ability to communicate with counsel or assist in the defense as to constitute a violation of defendant's rights to due process or the effective assistance of counsel." (*Id.* at pp. 1002-1003.) Indeed, defense counsel assured the trial court that defendant was okay to proceed after raising the conditions at the start of the second day of evidence.

Defendant also raises an equal protection challenge, not raised in *Jenkins*, but he has not persuaded this court that counsel's performance was deficient for failing to raise the equal protection challenge in the trial court. Defendant cites *People v. Taylor* (1982) 31 Cal.3d 488, in which the California Supreme Court held that "the refusal to allow [the] defendant to wear civilian clothing at trial constituted a violation of due process and equal protection." (*Id.* at p. 493.) After discussing the due process violation, the court went on to explain that requiring a defendant to go to trial in jail clothing " 'operates usually against only those who cannot post bail prior to trial. Persons who can secure release are not subjected to this condition. To impose the condition on one category of defendants, over objection, would be repugnant to the concept of equal justice embodied in the Fourteenth Amendment.' " (*Id.* at p. 495.)

Defendant does not assert that he was tried in jail clothing. Instead, he argues that the lack of sufficient sleep and a shower violated his right to due process and equal protection, relying on two federal district court decisions, *Dillard v. Pitchess* (C.D.Cal. 1975) 399 F.Supp. 1225 and *Rutherford v. Pitchess* (C.D.Cal. 1978) 457 F.Supp. 104. Those decisions arose out of civil rights actions brought on behalf of pretrial detainees in Los Angeles County. In *Dillard*, after describing a typical day of trial for such a detainee, the court stated: "For a man to be subjected to such a procedure for just one day, while

9

he is undergoing the emotional strain inherent in attending his own trial or other court proceeding, would likely bring him to a condition approaching physical and nervous exhaustion by early afternoon.  To require it of him on successive days is intolerable, for his ability to be of assistance to his attorney or otherwise conduct himself to his best advantage must necessarily be affected.  Certainly, due process of law requires that a defendant not be denied the opportunity for a reasonable night's sleep before each day of his trial."  (*Dillard*, at p. 1237; see also *Rutherford*, at pp. 114-115.)  The court in *Dillard* also found the conditions of confinement experienced by the detainees violated their right to "equal protection of the laws in contrast to defendants in criminal cases that remain at liberty pending trial because they can afford to post bail."  (*Dillard*, at p. 1235.)

In *Jenkins*, however, the California Supreme Court cited the *Dillard* case, and other similar civil rights actions, but nevertheless concluded the conditions challenged in *Jenkins* "had no prejudicial effect on [the defendant's] ability to assist in his defense or on counsel's ability to defend him."  (*Jenkins, supra*, 22 Cal.4th at p. 1003.)  Defense counsel in this case could have reasonably concluded, based on *Jenkins*, that raising an equal protection challenge in a motion for mistrial would have been rejected by the trial court.  This is because, even if an equal protection violation occurred, "[a] motion for mistrial should be granted ' "only when a party's chances of receiving a fair trial have been irreparably damaged." ' [Citation.]"  (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)  The record on appeal does not demonstrate that the conditions of defendant's confinement irreparably harmed his chances of receiving a fair trial.  We therefore decline to conclude that defense counsel acted unreasonably in failing to challenge those conditions in a motion for mistrial.

In addition, defendant has not established resulting prejudice.  The evidence adduced against defendant in this case was overwhelming.  Defendant has not shown that he "suffered prejudice to a reasonable probability, that is, a probability sufficient

to undermine confidence in the outcome." (*Gray, supra*, 37 Cal.4th at p. 207.) His assertion of ineffective assistance of counsel fails for this reason as well.

DISPOSITION

The judgment is affirmed.

/S/
_____
MAURO, Acting P. J.

We concur:

/S/
_____
DUARTE, J.

/S/
_____
KRAUSE, J.

11