**Jack JERSAWITZ, Plaintiff-Appellant,**

v.

**Jack HANBERRY, et al.,
Defendants-Appellees.**

No. 85–8434.

United States Court of Appeals,
Eleventh Circuit.

March 10, 1986.

Rehearing and Rehearing En Banc
Denied April 17, 1986.

Jeffrey O. Bramlett, Atlanta, Ga., Norman P. Stein, University, Ala., Gary A.

---

Ratner, Michael J. Gerhardt, Atlanta, Ga., for plaintiff-appellant.

Robert Tayloe Ross, Asst. U.S. Atty., Atlanta, Ga., for defendants-appellees.

Before JOHNSON and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

Plaintiff Jersawitz, a self-styled independent journalist, sought a declaratory judgment against the Warden and another official of the Atlanta Penitentiary, that a prison regulation which limits interviews with inmates to representatives of the news media whose principal employment is to gather or report news for a radio or television news program of a station holding a Federal Communications Commission license is unconstitutional insofar as it distinguishes between Jersawitz and the defined representatives of the news media. The district court, 610 F.Supp. 535 (1985), upheld the constitutionality of the regulation and granted summary judgment for the defendants. We affirm.

The facts are undisputed. Jersawitz self-produces an editorial-type television show called "Let's Tell It Like It Is" and utilizes a public access channel operated by Prime Cable, Channel 12, Atlanta to project his show. He was not and is not an employee of Channel 12. In fact he has never been employed by anyone to gather or report news. The station is independent from major media organizations and, according to Jersawitz, any citizen can walk in off the street and utilize the facilities of public access free of charge. Channel 12 does not ordinarily supervise the taping of anyone's shows, and it exercises little, if any, control over the programming.

Jersawitz requested permission to interview Father Bourgeois, a critic of United States foreign policy, who was a prisoner confined in the Atlanta Federal Penitentiary. He intended to tape and then replay the interview on his show. The Warden denied Jersawitz access to the penitentiary on the ground that he was not a representative of the news media as that term is defined in the media access regulation established by the Bureau of Prisons, 28 C.F.R. Section 540.2(G)(4). The regulation governs federal prisoners contact with the media and defines representatives of the news media in pertinent part "as ... persons whose principal employment is to gather or report news for ... a radio or television news program of a station holding a Federal Communications license." Jersawitz concedes that he is not a representative of the news media as defined by the regulation.

The district court, in upholding the constitutionality of the regulation, applied the traditional rational relationship test in evaluating the challenge to the regulation, concluding that a compelling state interest analysis proposed by Jersawitz was inappropriate because the case neither involved a suspect class nor implicated fundamental constitutional rights. The court found that the Bureau of Prisons had a rational basis for its classification and granted the Bureau of Prisons' motion for summary judgment.

Jersawitz' basic attack on the constitutionality of the Bureau of Prisons regulation is that it does not give even-handed treatment to journalists, that is, if the Bureau of Prisons admits some journalists to the penitentiary for a face-to-face interview with a certain inmate, it must let all journalists in for the same purpose absent a showing of compelling state interest. Jersawitz contends that the regulation is unconstitutional because it discriminates among journalists based upon their employment status.

At the outset we note that there is nothing in the record to indicate that the difference in classification in the regulation, i.e.

those journalists who may, and those who may not gain access to the Atlanta Federal Penitentiary, is content based. Nor is there any evidence of bad faith on the part of the government in adopting such a classification.

■ We need not pause long to dispose of the First Amendment claim. It is now settled without peradventure that newsmen have no constitutional rights of access to prisons or their inmates beyond that afforded the general public. *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). Accepting the holding in these cases as he must, Jersawitz turns to the Equal Protection Clause and argues that *Pell* and *Saxbe* are distinguishable from this case because in both of those cases the restrictions to access were on an even-handed basis, and the journalists were therefore no more disabled than the general public. Yet when the Bureau of Prisons here says that it is in the public interest to grant face-to-face interviews with inmates, but that to insure fair and accurate reporting the Bureau of Prisons will decide which journalists are fair and objective, it oversteps the even-handed approach under the equal protection guarantee.

Jersawitz' argument states, then builds upon a slanted premise. The regulation was not adopted for the purpose of providing, nor can it be construed to mean, that the Bureau of Prisons could give or withhold access to the Atlanta Maximum Security Penitentiary simply on its decision whether or not a newsman would report fairly and objectively. In clear terms the regulation recognizes the need for the prison to maintain security and order within the prison and allow limited access for interviews by insuring that the representatives of the news media are responsible persons employed by and responsible to recognized media organizations. This permits the prison facility to identify those persons who are not likely to pose any threat to security without the facility having to conduct extensive individual investigations of each applicant. Thus, it provides the public with an objective and accurate news presentation by a person whose profession is gathering and reporting news without the likelihood of breaching the prison's security. Jersawitz contends that this is not enough. Since the Bureau of Prisons grants the privilege to selected categories of the media while denying it to him, the regulation violates the Equal Protection Clause unless the Bureau of Prisons can show a compelling state interest to validate the classifications, and this it has failed to do. We agree with the district court that the compelling state interest analysis only arises in cases involving governmental action which implicates a constitutional right or affects a suspect class. This case does not involve a claim of constitutional magnitude, a suspect class, invidious discrimination, or any other matter that would require strict scrutiny of the Bureau of Prisons regulation here at issue.

We have no difficulty in agreeing with the district court's holding that the Bureau of Prisons regulation is rationally related to the Bureau of Prisons "obvious need to maintain security and order within the prison, and the administrative need in implementing visitor regulations." This is especially true, where, as here, we are dealing with a maximum security penitentiary. It is undeniable that the administration of the penal system is a task of monumental proportions, *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 3231, 82 L.Ed.2d 438 (1984), and that the necessity to preserve order and authority in the prisons is self-evident. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). Security is the prime concern and is central to all other correctional goals, *Pell, supra,* 417 U.S. at 823, 94 S.Ct. at 2804. As pointed out in *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979):

[T]he problems that arise in the day-to-day operation of a corrections facility are

not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. (Citations omitted). "Such considerations are peculiarly within the province of professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. *Pell v. Procunier,* 417 U.S. at 827 [94 S.Ct. at 2806]."

We cannot say that the Bureau of Prisons in any way exaggerated the legitimate concern or abused its discretion in promulgating the regulation in question.

Finally Jersawitz contends that to sustain a classification system that differentiates between members of the news media on the basis of their employment, the government must demonstrate that it selected the regulatory path least restrictive of a constitutionally-protected interest. As we have already said, this case does not involve a claim of constitutional magnitude. In any event, this argument was peremptorily disposed of in *Block v. Rutherford, supra,* 104 S.Ct. at 3235 n. 11, in which the court said, "We reaffirm that administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives" (citing *Bell v. Wolfish,* 441 U.S. 542 n. 25, 99 S.Ct. 1876 n. 25.).

We conclude that the challenged Bureau of Prisons regulation does not create an arbitrary classification in violation of Jersawitz' right to equal protection of the law. The regulation bears a rational relationship to the objective of maintaining order and security in the maximum security Atlanta Federal Penitentiary while granting limited access to the prison to interview face-to-face designated inmates by "representa-tives of the news media" as they are defined in the regulation. *See Johnson v. Robinson,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

AFFIRMED.