

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1998

# Abu-Jamal v. Price

Precedential or Non-Precedential:

Docket 96-3756

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Abu-Jamal v. Price" (1998). *1998 Decisions*. Paper 203.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/203

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3756

MUMIA ABU-JAMAL,
        Appellant

v.

JAMES PRICE, in his official capacity as Superintendent
of the State Correctional Institution at Greene; MARTIN
HORN, in his official capacity as Commissioner of the
Pennsylvania Department of Corrections; THOMAS
FULCOMER, in his official capacity as Deputy
Commissioner of the Pennsylvania Department of
Corrections

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 95-cv-00618)

Argued: December 8, 1997

Before: NYGAARD, ALITO, and LAY,* Circuit Judges

(Opinion Filed: August 25, 1998)

_____

* The Honorable Donald P. Lay, Circuit Judge for the United States Court
of Appeals for the Eighth Circuit, sitting by designation.

          Timothy P. O'Brien
          Mitchell, O'Brien & Krakoff
          429 Forbes Avenue
          1705 Allegheny Building
          Pittsburgh, PA 15219

          Jere Krakoff (Argued)
          Pennsylvania Institutional Law
           Project
          1705 Allegheny Building
          Pittsburgh, PA 15219

          Counsel for the Appellant

          Amy Zapp (Argued)
          Office of Attorney General of
           Pennsylvania
          Department of Justice
          Strawberry Square, 15th Floor
          Harrisburg, PA 17120

          Thomas F. Halloran, Jr.
          Office of Attorney General of
           Pennsylvania
          564 Forbes Avenue
          Manor Complex
          Pittsburgh, PA 15219

          Counsel for Appellees

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellant Mumia Abu-Jamal was convicted of murdering a Philadelphia police officer and is currently on death row at the State Correctional Institute at Greene. The Pennsylvania Department of Corrections has a rule that prohibits inmates from carrying on a business or profession. Jamal alleges that this rule is unconstitutional and that the Department used this rule as a pretext to retaliate against him for the content of his writings, radio commentaries, and his book, Live From Death Row, which he wrote while at the State Correctional Institution at

Huntingdon. He alleges that this retaliation included opening, reading and distributing his legal mail by Department officials and denying visits by his paralegals.

Jamal filed suit against the Department and Superintendent James Price seeking declaratory and injunctive relief under 42 U.S.C. S1983. He claims that the Department violated his rights under the First and Fourteenth Amendments, and challenges the business or profession rule. He sought a preliminary injunction to prevent the Department from investigating violations of, and enforcing its business or profession rule against him. When he made the motion, Jamal was serving a prison disciplinary sentence for engaging in the profession of journalism at S.C.I. Greene.

The district court denied Jamal's motion for a preliminary injunction against the enforcement of the business or profession rule, but granted a limited injunction against the opening of Jamal's legal mail. The court held that the disciplinary proceedings and the Department's decision to open Jamal's mail were not motivated by retaliation for Jamal's writings. Instead, the district court held that the Department initiated these actions after it suspected that Jamal had entered into a contract with a publisher for compensation. The trial court also denied Jamal's motion to rescind disciplinary action for violating the business or profession rule. The court, however, enjoined the reading, photocopying, distributing or collection of his legal mail, except to "investigate the violation of prison regulations or other misconduct." Finally, the court denied Jamal's motion to enjoin the Department from requiring paralegals to be trained or licensed and to work under contract with the attorneys, concluding that the Department had valid, nonretaliatory reasons for enforcing the visitation rule.[1] Jamal appeals.

_____

1. The Department also denied media requests for interviews from February through June of 1995. During that time, the Department granted media requests for other inmates. The district court found that the Department's justifications for denying media access to Jamal were not credible, and concluded that this action was clearly retaliatory. The district court granted an injunction prohibiting further denials of media access. This order is not challenged on appeal.

3

We conclude that Jamal has a reasonable probability of demonstrating that the Department's actions violated his rights under the First and Fourteenth Amendments, and that Jamal has demonstrated that he will be subject to irreparable harm if the injunction is not granted. Accordingly, we will reverse, and remand the cause to the district court with instructions to enjoin the investigation and enforcement of the business or profession policy as it pertains to Jamal. We affirm the district court's order insofar as it denied Jamal's motion to enjoin the Department's visitation restrictions.

I.

Jamal worked as a journalist before his conviction, and he has continued to write articles while incarcerated. Approximately forty publications carried articles under Jamal's byline on a regular basis while he was incarcerated at S.C.I. Huntingdon. Supporters would send copies of Jamal's published articles via regular prison mail. S.C.I. Huntingdon corrections officers opened and searched these articles as part of screening procedures. For instance, on one occasion, the superintendent of S.C.I. Huntingdon commended Jamal for a Yale Law Journal article. See Mumia Abu-Jamal, Teetering on the Brink: Between Death and Life, 100 Yale L.J. 993 (1991). Jamal received compensation for the Yale article, and for other articles published by The Nation, Covert Action, and Against the Current. Department officials were not aware, however, that Jamal was paid for any other publications.

In July of 1992, Jamal recorded an extensive interview with the Prison Radio Project, which aired in segments featured as commentaries from Jamal. Jamal did not receive compensation for these interviews. The Prison Radio Project wrote a letter to the assistant superintendent in August of 1992 requesting permission to regularly tape and air commentaries by Jamal, who would be introduced as a correspondent. In the same letter, the Project informed the Department that they were "in the process of approaching publishers with a book proposal."

The Department denied the Project's request to tape regular commentaries, stating that "it does not permit

inmates to conduct or participate in regularly scheduled news broadcasts or commentary." In April 1994, National Public Radio also interviewed Jamal, and intended to use the recordings as commentaries critical of prison life, among other topics. NPR paid Jamal for these interviews, which focused considerable media attention on Jamal's case. Several members of the public and the Fraternal Order of Police contacted the Department to express outrage that a convicted murderer could benefit from his status.

As a result of the complaints, the Department began to "investigate" whether Jamal was violating the business or profession rule, despite the fact that Jamal freely admitted that he was writing and publishing his works. It instituted a "mail watch" in August of 1994, which is separate and distinct from the routine search of incoming personal mail. Under a mail watch, corrections officers were entitled to open Jamal's legal mail outside of his presence.

The business or profession rule states, in relevant part:

> "No inmate is permitted to incorporate or engage in a business or profession while under the supervision of the Department of Corrections except as indicated below.2 An inmate who is engaged in a business or profession prior to incarceration is expected to assign authority for the operation of such business or profession to a person in the community."

(footnote added). The Department contends that it reviewed Jamal's legal mail specifically to determine whether one of Jamal's attorneys was helping him obtain compensation for his writing and commentaries, even though the business or profession rule applies irrespective of whether Jamal is compensated.

_____

2. The exceptions to this rule allow inmates to continue to make major decisions, on occasion, that substantially affect their businesses; and allow unsentenced inmates, inmates on work release, and inmates in community corrections programs, to continue to practice a business or profession provided their work does not impose a burden on prison administration.

Department of Corrections officials opened Jamal's legal mail, copied it, and sent it to David Horwitz, assistant general counsel of the Department of Corrections. Horwitz read the letters in their entirety, and concluded that they were not relevant to the Department's investigation. In the face of this conclusion, and even though Horwitz determined that the letters were pertinent to Jamal's state appeals, Horwitz forwarded them to Chief Counsel Young and to Brian Gottlieb, Deputy Counsel in the Office of the General Counsel--the office charged with advising the Governor of Pennsylvania on, among other things, signing death warrants.

The Department forwarded three letters from Jamal's attorneys to the governor's office. Two of those letters, dated August 16, 1994 and August 23, 1994, were from Jamal's lead attorney in his state appeal and contained a candid discussion of the merits of his claim and sensitive information regarding the defense strategy. The third letter, dated August 25, 1994 had been written by staff counsel on Jamal's state appeal, and also discussed his case. The Department continued a "mail watch" on Jamal's legal mail from August 1994, until Jamal filed this lawsuit, and confiscated and copied various incoming and outgoing letters. When Jamal filed his motion for a preliminary injunction, he had entered into a contract with Emerge Magazine to submit an article. The Department continued its investigation of Jamal.

In September 1994, the Department became suspicious of the number of people admitted as paralegals for legal visits with Jamal. Jamal's attorney designated six legal assistants. Among these were Noelle Hanrahan, who was also working with Jamal as part of the Prison Radio Project; Jeannette Patton and Bobby Blocker, who were involved in fund-raising for Jamal's legal defense; and Jamila Levi, who calls herself Jamal's "spiritual sister" and had visited Jamal in the past. Levi visited Jamal as a social visitor in October 1993 and began visiting as a paralegal in October 1994. In January of 1995, she was admitted as a social guest. In February of 1995, she was admitted as a paralegal four times. Levi marked herself as "friend" in the prison's visitors book even when she was admitted for legal visits,

and had written articles complaining of the limits imposed upon social visits for death row inmates.

In a February 24, 1995 letter, the Department wrote to Jamal's attorney: "it is not sufficient merely to designate persons as investigators and paralegals unless the identified individuals can produce documentation that they are, in fact, licensed investigators or credentialed paralegals acting under contract with, or as employees of the attorney." These requirements went beyond those set forth in prison regulations.3 Levi was not licensed as an investigator, had no legal training, was not employed by Jamal's attorney, and was not receiving compensation for her visits. Levi was denied admission as a paralegal on February 28, 1995.

II.

We must determine whether the district court erred as a matter of law when it decided Jamal's motion for a preliminary injunction. Our review is plenary. See Olde Discount Corp. v. W. Michael Tupman, 1 F.3d 202, 206 (3d Cir. 1993). We review the district court's findings of fact for clear error. Philadelphia Marine Trade Ass'n v. Local 1291, 909 F.2d 754, 756 (3d Cir. 1990). We first consider Jamal's request to enjoin the investigation and enforcement of the business or profession rule against him.

Prison regulations that curtail an inmate's constitutional rights are valid if reasonably related to legitimate penological objectives. Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987). The deference we accord to the Department in establishing, interpreting and applying prison regulations presents a formidable barrier to Jamal's claim that the prison regulations are unconstitutional. See Turner, 482 U.S. at 89, 107 S. Ct. at 2262 (noting that less

_____

3. Under DCM–812, an inmate's attorney may designate persons, such as law students, paralegals, or investigators to visit the inmate to act as the
attorney's agent. The attorney is required to submit a "written statement signed by the attorney on the letterhead of his or her firm identifying each person as the attorney's agent and attesting that the visit is for the
purpose of legal consultation."

7

stringent First Amendment scrutiny is appropriate in the prison setting because "prison administrators . . . and not the courts [are] to make the difficult judgments concerns the institutional operations.") Incarceration, however, necessitates that many rights and privileges, including rights derived from the First Amendment, be eliminated or curtailed. Pell, 417 U.S. at 822, 94 S. Ct. at 2804.

In Turner, the Supreme Court listed four factors to help determine whether prison regulations and practices are reasonable:

> "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.

> A second factor relevant in determining the reasonableness of a prison restriction, as Pell shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.

> A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be

8

particularly deferential to the informed discretion of corrections officials.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns. This is not a least restrictive alternative test prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."

Turner, 482 U.S. at 89–91, 107 S. Ct. at 2262 (citations and internal quotation marks omitted).

Federal Rule of Civil Procedure 65 permits a court to grant a preliminary injunction if the moving party demonstrates a likelihood of success in the litigation, and that he will suffer great or irreparable injury absent an injunction. Fed. R. Civ. P. 65; Delaware River Port Auth. v. Transamerican Trailer Tranp. Inc., 501 F.2d 917, 919–20 (3d Cir. 1974). Accordingly, to succeed on his motion for a preliminary injunction, Jamal must first demonstrate that the business or profession rule, as enforced against him, is not reasonably related to any legitimate interests. We conclude that Jamal has satisfied this requirement because he is likely to show: first, that the Department enforced the business or profession rule because of the content of his writings; second, that his writing does not affect the allocation of prison resources, other inmates, or the orderly administration of the prison system any more than does the writing of other inmates; and third, that there are obvious, easy alternatives to address the Department's security concerns.

A.

Prison regulations, like the business or profession rule, which restrict an inmate's First Amendment rights must

9

operate in a neutral fashion, without regard to the content of the expression. Turner, 482 U.S. at 90, 107 S. Ct. at 2262. We analyze content neutrality in the prison context differently than we do for non-inmates. Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 133, 97 S. Ct. 2532, 2541 (1977). For example, limiting speech that may include escape plans or incite other prisoners would be a valid response to a potential security threat,"even though the same showing might be unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." Id. at 133 n. 9, 97 S. Ct. at 2541 n. 9 (citation and internal quotation marks omitted). Nevertheless, once prison security is accomplished, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974).

The superintendent of the S.C.I. Huntingdon was aware of Jamal's writings when Jamal published the Yale article in 1991. An August 16, 1992 letter to the Department noted that Jamal was approaching publishers regarding a book deal. Nevertheless, the Department did not begin to investigate him until May 6, 1994, after National Public Radio sought permission to broadcast Jamal's interviews as regular commentaries. The district court determined that "the investigation was initiated after public complaints concerning Jamal's proposed NPR commentaries were made by the Fraternal Order of Police" and concluded that any delay in the Department's enforcement of the rule was attributable to its investigatory procedures. As a result, it held that Jamal was unlikely to succeed in showing that the action was in retaliation against the content of his writings. We disagree, and conclude that the district court erred.

The Department began its investigation under public pressure to do so, and because of the content of Jamal's writing, not because he was being paid for it. Indeed, under the Department's own regulations, compensation is irrelevant in these circumstances. Furthermore, corrections officers permitted another inmate at the S.C.I. Huntingdon

10

to publish, promote, and receive royalties for a novel without punishment despite the business or profession rule.

The Department states that the rule is justified by "multifarious purposes and the impossibility of accommodating the practice of a profession or business in a penal setting." (Appellee's Br. at 25.) There is no evidence, however, that Jamal's prison writing,[4] any more so than that of other inmates, has strained prison resources, contributed to unrest among the inmate population, or enhanced Jamal's stature as a prisoner, resulting in danger to himself or others. To the contrary, the Department was able to accommodate a live radio call-in show to promote another inmate's book. From the record it appears that Jamal's writing affected prison administration only when it went through the mail screening system--just like the rest of the inmates' mail. Until it imposed its "mail watch," the Department did not have to make any special accommodations for Jamal's writing. As for the Department's remaining asserted interest -- ensuring that prisoners are unable "to carry on with life as usual," Appellee's Br. At 8 -- the Department has failed to explain how this interest is reasonably advanced by allowing some prisoners to publish books but not allowing Jamal to do likewise. Even if this interest might justify a rule that precludes inmates from receiving compensation for their writings, we need not resolve the issue whether this interest can justify a rule preventing uncompensated (as opposed to compensated) speech, because we conclude that it is likely that Jamal can demonstrate that the Department's enforcement of the business or profession rule against him, was motivated, at least in part, by the content of his articles and mounting public pressure to do something about them, and hence, the actions were not content neutral as required by Turner, 482 U.S. at 90, 107 S. Ct. at 2262, and Pell, 417 U.S. at 822, 94 S. Ct. at 2804.

_____

4. Writing also happens to have once been Jamal's profession, and he began to write in prison as early as 1989.

11

B.

Jamal is likely to demonstrate that his writing neither
requires accommodation by prison officials, nor affects
other inmates or the allocation of prison resources. The
Supreme Court discussion in Turner bears repeating here:

> "In the necessarily closed environment of the
> correctional institution, few changes will have no
> ramifications on the liberty of others or on the use of
> the prison's limited resources for preserving
> institutional order. When accommodation of an
> asserted right will have a significant "ripple effect" on
> fellow inmates or on prison staff, courts should be
> particularly deferential to the informed discretion of
> corrections officials."

Turner, 482 U.S. at 90, 107 S. Ct. at 2262. The record
contains no evidence of such a "ripple effect." As explained
before, Jamal was acting as a journalist from 1986, and the
Department did not claim to be burdened by his actions
until the Fraternal Order of Police outcry in 1994.

C.

Naturally, an inmate relinquishes some First Amendment
rights that he would enjoy if not incarcerated. Jones, 433
U.S. at 125, 97 S. Ct. at 2538. "The concept of
incarceration itself entails a restriction on the freedom of
inmates to associate with those outside of the penal
institution. Equally as obvious, the inmate's `status as a
prisoner' and the operational realities of a prison dictate
restrictions on the associational rights among inmates." Id.
at 126, 97 S. Ct. at 2538. Nonetheless, Jamal is likely to
show that the Department's discriminatory application of
the business or profession rule to his writing is an
exaggerated response to the Department's security
objectives because there are obvious, easy alternatives to
address the Department's concerns. Id. If Jamal "can point
to an alternative that fully accommodates [his] rights at de
minimis cost to valid penological interests, [we] may
consider that as evidence that the regulation does not
satisfy the reasonable relationship standard." Id. The
Department could simply apply its rule in a content neutral

12

fashion. Without listing all the other possible alternative rules, the Department could apply the business or profession rule to those businesses that place a substantial burden on the Department's staff, which would tend to exclude writers, whether episodic or notorious. There are no doubt many businesses or professions, which if practiced within the prison, would necessarily burden prison officials or other inmates. As long as the inmate/writer does not attain a special status, threaten corrections officers, or incite the inmate population, a more narrow rule could sufficiently protect the Department's security interests.

The record does not show that the Department actions were motivated by concerns about escape plans, plans about ongoing criminal activity, or threats. To the contrary, it appears that Jamal's activity has not heightened tensions at the prison, and that his writings do not advocate violence, have any impact on the prison population, threaten corrections officers, or burden prison security resources. See, e.g., Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 1878 (1979). Instead, the Department's business or profession rule is a class two disciplinary provision, and violations are punishable at the same level as horseplay or smoking. Although, Jamal's articles, book, and radio commentaries may have generated controversy beyond prison walls, unless they amount to fraud, extortion, or threats to those outside the prison, the valid objectives dwindle. Hence, we conclude that Jamal is likely to demonstrate that the Department's enforcement of the business or profession rule with respect to him is too broad to be justified by the concerns articulated by the Department.

D.

Turning to the second prong of the Federal Rule of Civil Procedure 65 test, the district court held that Jamal did not face irreparable harm as a result of the investigation of the business or profession rule. The court held that Jamal "is and has been able to disseminate his ideas through the written work to any and all outlets without direct interference from [the Department]." We disagree.

13

We have already concluded that Jamal has a reasonable likelihood of success in showing that the Department violated his First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689 (1976). This harm--the investigation for violations of the business or profession rule--was both threatened and occurring at the time of respondent's motion. Under Elrod, this is sufficient to show irreparable harm because the timeliness of speech is often critical. See id. at n.29.

Importantly, Jamal is a condemned man, whose only time to speak and write is now. The Department has not disavowed its intent to enforce the business or profession rule, and Jamal has also unequivocally stated that he will continue to write. Thus, there is no reason to believe that the Department will not subject Jamal to the same treatment in the future. The district court held that the reading and copying Jamal's legal mail was acceptable if the prison officials had "a reasonable suspicion that plaintiff was violating an institutional regulation by engaging in a business or profession in which wittingly or not one or more of his attorneys was complicit." The Department argues in support that its decision to open Jamal's legal mail was necessitated by its investigation into whether Jamal was conducting a business or profession. This argument is nonsensical. We have difficulty seeing the need to investigate an act that Jamal openly confesses he is doing. Jamal's writing is published, and he freely admits his intent to continue. Continued investigation and enforcement of the rule invades the privacy of his legal mail and thus directly interferes with his ability to communicate with counsel.

The district court's injunction is too narrow to protect Jamal from irreparable harm that results from opening his confidential legal mail. We conclude that Jamal has a reasonable likelihood of success in showing that the Department's application of the business or profession rule in this case violates his right to free speech. We will therefore remand the cause to the district court with instructions to grant Jamal's preliminary injunction,

14

preventing the Department from opening his mail on the pretext that it is investigating violations of the business or profession rule.

III.

Finally, we turn to Jamal's claim that the Department retaliated against him by restricting paralegal visits. Here, the facts show that Jamal is not likely to succeed on the merits, because the Department has articulated a valid, content neutral reason for applying more strict visitation rules to Jamal's visitors. Turner, 482 U.S. at 89, 107 S. Ct. at 2262.

Indeed, the facts show that the Department had a legitimate reason to suspect that legal visitation privileges were being abused so that Jamal could receive more than the permitted number of social visits. Jamila Levi made a personal visit to Jamal during October 1993, visited as a paralegal in October 1994, as a social guest in January of 1995, and visited as a paralegal four times in February 1995. Levi marked herself as "friend" in the prison's visitors book even when she was admitted for legal visits.

Jamal's visitation claim also implicates his constitutional right of access to courts. In such a case we weigh the extent to which his rights are burdened, against the "legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." Procunier v. Martinez, 416 U.S. 396, 420, 96 S. Ct. 1800, 1815 (1974), overruled in part on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 109 S. Ct. 1874 (1989). In Procunier, the prison regulation absolutely prohibited the use of law students and paraprofessionals. Id. Here, however, the Department has only asked for verification that the legal visitors are credentialed or employed by the attorney. Jamal has not demonstrated that the paralegal visitation restriction delayed or hindered his state court appeal. Visitation––whether it is legal or personal––may jeopardize the security of a facility. We must defer to the expertise of prison officials to assess the security of the facilities and to assure that legal visitors are properly admitted. Cf. Block v.

15

Rutherford, 468 U.S. 576, 586, 104 S. Ct. 3227, 3234 (1984). Accordingly, we conclude that security concerns outweigh any burdens placed on Jamal's state court appeal and affirm the district court's denial of Jamal's motion to enjoin the Department's visitation restrictions.

IV.

To summarize, we hold that Jamal is likely to demonstrate first, that the Department enforced the business or profession rule against him based upon the content of his writings; second, that his writing does not affect the allocation of prison resources, other inmates, or the orderly administration of the prison system any more than does writing of other inmates; and third, there exist obvious, easy alternatives open to the Department to address its security concerns. After considering all of these factors,5 we conclude that Jamal is likely to demonstrate that there is no valid, rational connection between the Department's application of the business or profession rule in this case and a legitimate penological interest. Thus, he is likely to succeed in showing a First Amendment violation, and we hold that he will suffer irreparable injury as a result. Accordingly, we will reverse that portion of the district court's order respecting this issue, and instruct it to enjoin the investigation and enforcement of the business or profession rule as it pertains to Jamal; and enjoin the Department from opening Jamal's legal mail to investigate whether he is violating the business or profession rule.

We also conclude that Jamal is not likely to succeed in showing that the Department retaliated against him by limiting paralegal visits, and on this issue we will affirm the district court.

_____

5. We note that neither party addressed the remaining Turner factor -- whether there are alternative means of exercising the right that remain open to prison inmates, See Turner, 492 U.S. at 90 -- and we have thus considered this to be a neutral factor for purposes of our analysis.

16

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

17